In the MATTER OF the COMPLAINT OF MANHATTAN BY SAIL, INC. and Shearwater Holdings, Ltd., as Owners, Operators, and Agents of the Excursion sailing vessel, Shearwater Classic Schooner for Exoneration From or Limitation of Liability.

12–CV–8182 (VEC)

United States District Court, S.D. New York.

Signed 01/27/2016

Guerric S.D.L. Russell, David Riordan Hornig, Nicoletti Hornig & Sweeney, New York, NY, for Petitioner.

Jonathan Robert Ratchik, Kramer & Dunleavy, L.L.P., New York, NY, for Respondent.

## FINDINGS OF FACT & CONCLUSIONS OF LAW

VALERIE CAPRONI, District Judge

The Shearwater Classic Schooner is an old sailing vessel that cruises New York Harbor and around the Statue of Liberty. On April 30, 2011, Charis Tagle ("Respondent") took a cruise on the Shearwater. Unfortunately, her cruise was not entirely pleasant. As the vessel was shifting from auxiliary power to wind power, a deckhand lost control of the halyard, and a metal clip attached to the halyard swung and struck Ms. Tagle. The clip knocked Ms. Tagle's sunglasses off and inflicted a cut on her face.

The Shearwater completed its cruise, and approximately a year later, Ms. Tagle filed a lawsuit in Supreme Court, New York County. On November 9, 2012, pursuant to the Limitation of Liability Act, 46 U.S.C. § 3051 *et seq.* and Supplemental Rule F of the Federal Rules of Civil Procedure, Manhattan By Sail, Inc. and Shearwater Holdings, Ltd. ("Petitioners"), the owners and operators of the Shearwater, filed a Complaint for Exoneration from or Limitation of Liability in the Southern District of New York. (Dkt. 1). On June 11, 2013, Judge Carter, to whom the matter was assigned, issued an Order restraining suits, approving interim security, and directing the filing of claims. (Dkt. 9). Accordingly, the tort action in New York Supreme Court has been stayed pending completion of this action. On March 6, 2014, the case was reassigned to this Court.

On April 9, 2015, this Court ordered that the issues of negligence and privity be

severed for trial from the issue of the value of the vessel. (Dkt. 50). The trial was held on June 16 and 17, 2015. Because the Court finds that Respondent has not satisfied her burden of proof to show that there was negligence on the part of the vessel's crew, the Court grants Petitioners' request for an Order of Exoneration with respect to any and all liability arising from the incident on April 30, 2011.

## FINDINGS OF FACT

1. The Shearwater is an eighty-two foot long, thirty-six gross ton sailing vessel that is documented with the United States Coast Guard. Pet. for Limitation of Liability ("Pet.") ¶ 6 (Dkt. 1); Resp't Revised Findings of Fact and Conclusions of Law ¶ 6 (Dkt. 81).

2. On April 30, 2011, the Captain of the vessel was David Zimmerman. Pet'r Proposed Findings of Fact and Conclusions of Law 1 (Dkt. 80). Captain Zimmerman holds a Coast Guard one hundred-ton inland master license with an auxiliary sail endorsement. Tr. 142:9-10. He has been sailing since he was a child and has worked on the Shearwater since 2005. Tr. 143-150, 151:7-17.

3. On April 30, 2011, Christopher Biggins was a deckhand on the Shearwater. Pet'r Proposed Findings of Fact and Conclusions of Law 2; Tr. 277:19–21. Biggins holds a Coast Guard one hundred-ton license with an auxiliary sailing endorsement. Tr. 271:9–18. Biggins has extensive sailing experience and had been working on the Shearwater since 2007 or 2008. Tr. 268:18–19, 269–70.

4. The Shearwater uses two sails: the main sail and the forestaysail. Tr. 39–40. The forestaysail is raised using a line called a halyard. Tr. 40–41. The halyard is attached to the sail using a pelican clip; the clip attaches the halyard to a ring on the sail.[1] Tr. 42:12–22. The halyard then runs from the sail to the top of the mast, where it passes through a block or pulley; the halyard then runs down to the deck level. Tr. 40:6–11. In order to raise the sail, a deckhand hauls on the halyard. Tr. 41:17–21. For the sail to be raised, the halyard must be attached to the sail. Tr. 43:1–6.

5. It was the normal practice of the Shearwater crew to place sail covers over the sails at the end of the day. Tr.159:3–4, 159:9–11. Thus, each morning, the sail covers had to be removed prior to the initial cruise of the day. Tr. 159:12–13.

6. The halyard cannot be attached to the sail when the sail covers are on. Tr. 157:2-22.

7. After the sail covers are removed, before the first cruise of the day, the halyard is attached to the forestaysail. Tr. 159:14–22.

8. When the Shearwater returns from each cruise, the main sail and the forestaysail are lowered (or struck) as the vessel approaches the North Cove Marina, and when in the Marina, the vessel operates using a motor. Tr. 69:17–22, 167:2–14, 183:18–21.

9. When the forestaysail is struck, it is tied to the mast using sail ties. Tr. 175:14. Other than after the last cruise of the day in order to install the sail covers, there is no reason to unclip the halyard from the forestaysail when it is lowered. Tr. 168:5– 8. Standard operating procedure on the Shearwater was and is to leave the halyard attached between trips. Tr. 167–68, 235:19–236:36, 237:14–19, 275:19–24.

10. Ms. Tagle was a fare paying passenger on the Shearwater's second cruise on April 30, 2011. Pet. ¶ 12; Resp't Revised Findings of Fact and Conclusions of

1. The clip weighs about a pound and is made of stainless steel. Tr. 195:11–16.

Law ¶ 10. The Shearwater left its docking place in the North Cove Marina at approximately 2:45 p.m. Pet. ¶ 8; Resp't Revised Findings of Fact and Conclusions of Law ¶ 10.

11. Biggins was handling the halyard when the incident occurred. Tr. 277:25–278:4. The Court credits Biggins testimony that he does not know why the line was detached from the sail but that the only reason he would have detached the halyard from the sail was if the line had become fouled.[2] Tr. 278:3–8. The Court also credits Biggins testimony that he was handling the halyard carefully when he lost control of the line. Tr. 278:16–22, 303:17–20, 304:12–13.

12. Biggins testified credibly that he does not recall what led to him losing control of the line but that he recalls that it struck Ms. Tagle. Tr. 278:13–15, 281:2–16, 296:1–3.

13. No witness testified why the halyard was not attached to the sail, and no one testified why Biggins lost control of the line. Tr. 209:11–19. Biggins, who was handling the line, could only speculate that the line must have been fouled, as there is no other reason to unclip the line from the sail. Tr. 217–18, 229, 236:4–12, 276–77, 278:3–8, 292.

14. After the incident with Ms. Tagle, Captain Zimmerman stressed to the crew that henceforth the halyard had to be attached to the forestaysail before the vessel left the dock and that, in the event the line

needed to be detached during a cruise, two crewmembers would need to handle the line. Tr. 211–12, 221–22, 234–35, 256:20–257:11.[3]

15. Sailing is inherently dangerous. Good seamanship requires the minimization of danger from flying objects, but those risks cannot be entirely eliminated. Tr. 46–47, 52, 95:13-20, 248:17–25, 248:7–12, 297–98, 300.

16. In the ordinary course of sailing, lines can become fouled. Tr. 178, 182, 229, 276:15–19.[4] Sometimes it is possible to "unfoul" a line by shaking the line while it is still attached to the sail, Tr. 305–06; at other times, it is necessary to unclip the line from the sail in order to unfoul the line, Tr. 177–78, 306. Lines become fouled on the Shearwater approximately once a month, Tr. 276, 308, and the halyard itself becomes fouled while the vessel is under sail several times a year, Tr. 309, 311. At times, despite an inspection of the mast before sailing, a fouled line is not detected until the vessel is under weigh. Tr. 198–99, 308:18–25.

17. Between 2001 and 2011, the Shearwater carried approximately 80,000 passengers. Tr. 334:23–335:6. Ms. Tagle is the only passenger who was injured because a crewmember lost control of a line. Tr. 332:24–333:3.

## CONCLUSIONS OF LAW

■ 1. Respondent bears the initial burden of proving by a preponderance of

---

2. A fouled line is a line that is twisted or otherwise tangled so it will not raise or lower a sail as required.

3. Under Coast Guard rules, the Shearwater is only required to have a Captain and one deckhand on board when it sails. Tr. 180:13–17. Thus, Captain Zimmerman's remedial efforts went beyond Coast Guard requirements.

4. Respondent's "expert," Roy Scott, testified that "there's really no way for" the line to

become fouled around the forestay "if the line is attached to the sail." Tr. 59. As between the Petitioners' witnesses, Biggins and Captain Zimmerman, both of whom had very substantial experience on sailing vessels and both of whom testified that the halyard does become fouled from time to time even when it is clipped to the sail, and Scott, who has very little experience on sailing vessels, Tr. 71–77, the Court credits the testimony of Petitioners' witnesses.

the evidence that the crew of the Shearwater was negligent in causing her injuries. Joint Pretrial Order 6 ¶ 1 (Dkt. 63).

2. If Respondent fails to satisfy her burden of proof, then the Petitioners are entitled to an Order of Exoneration with respect to liability arising from the April 30, 2011 incident. *Id.* 6 ¶ 2.

3. Negligence under maritime law requires: a showing of a duty; breach of the duty; a causal connection between the breach and the resulting injury; and actual loss, injury or damages. *Id.* 7 ¶ 5.

4. A vessel owner owes his passenger the duty to exercise reasonable care under the circumstances. *Id.* 7 ¶ 6.

5. After hearing the testimony and oral argument from the parties, on June 18, 2015, the Court ordered supplemental briefing on the doctrine of *res ipsa loquitur* as a way that Respondent might be able to satisfy her burden of proving negligence. (Dkt.74). In addition, the Court directed the parties to brief whether it could consider, in determining whether Respondent has satisfied her burden of proof, the fact that, subsequent to the incident, Captain Zimmerman instructed crew members that the halyard line must be attached to the forestaysail before passengers come on board and before the vessel leaves the dock.

6. New York law "recognizes what we know from our everyday experience: that some accidents by their very nature would ordinarily not happen without negligence." *Kambat v. St. Francis Hosp.*, 89 N.Y.2d 489, 494, 655 N.Y.S.2d 844, 678 N.E.2d 456 (1997) (quoting *Dermatossian v. New York City Tr. Auth.*, 67 N.Y.2d 219, 226, 501 N.Y.S.2d 784, 492 N.E.2d 1200 (1986)). In those circumstances, *res ipsa loquitur* applies.

7. When the doctrine of *res ipsa loquitur* applies, it permits, but does not compel, an inference of negligence.

*Johnson v. United States*, 333 U.S. 46, 48, 68 S.Ct. 391, 92 L.Ed. 468 (1948). In order for the doctrine to apply, Respondent must establish the following: "First, the event [is] of a kind that ordinarily does not occur in the absence of someone's negligence; second, [the event] must be caused by an agency or instrumentality within the exclusive control of the defendant [here, the vessel owner or operator]; and third, [the event] must not have been due to any voluntary action or contribution on the part of the [Respondent]." *Kambat*, 89 N.Y.2d at 494, 655 N.Y.S.2d 844, 678 N.E.2d 456 (citing *Ebanks v. New York City Tr. Auth.*, 70 N.Y.2d 621, 623, 518 N.Y.S.2d 776, 512 N.E.2d 297 (1987)); *see also Stone v. Courtyard Mgmt. Corp.*, 353 F.3d 155, 157 (2d Cir.2003).

8. The applicability of *res ipsa loquitur* in this case rests entirely on the first element: was this the kind of event that does not ordinarily occur in the absence of someone's negligence?

9. Respondent argues the answer is yes: "Had Mr. Biggins been exercising reasonable care in the handling of the pelican clip and forestaysail halyard, he would not have lost control of the same.... Absent any explanation as to why Mr. Biggins lost control of the pelican clip, the only logical inference is that he lost control of same because of his negligence and concomitant failure to exercise reasonable care." Resp't Post–Trial Letter Br. 2 (Dkt. 82).

10. In contrast, the Petitioner argues that the answer is no. Petitioner asserts that "Courts in this district of [sic] routinely held that the doctrine of *res ipsa loquitur* does not apply where the plaintiff's injury was caused by sea conditions." Pet'r Post–Trial Letter 1–2 (citing *Irwin v. United States*, 236 F.2d 774, 775–76 (2d Cir.1956); *Talton v. U.S. Lines Co.*, 203 F.Supp. 17, 19 (S.D.N.Y.1962)) (Dkt.79).

11. The Court agrees with the Petitioner. As Respondent's own expert testified at trial, sailing vessels are dangerous, Tr. 52, 95:13–20, and this vessel was cruising in fraught waters, Tr. 46–47. That testimony was echoed by the Petitioner, Tr. 297–98, 300, and is supported by common sense.

12. At the time of the accident, this particular vessel was sailing in the lower portion of the Hudson River, where it meets the East River and the New York Harbor. Tr. 47:3–4; Pet'r's Proposed Findings of Fact and Conclusions of Law 4; Resp't Revised Findings of Fact and Conclusions of Law ¶ 78. There is ample marine traffic in the area, which creates waves and wakes that can unexpectedly cause a vessel to move in unpredictable ways. Tr. 32, 46:19–22, 47:5–7. There is no evidence in the record that contradicts the common sense notion that a deckhand exercising due care can lose control of a line—which is why the lines should always be attached, if at all possible.[5]

13. Because the Court cannot find that this is the sort of accident that can occur only because of someone's negligence, the Court finds that the doctrine of *res ipsa loquitur* does not apply to this case. *See Seung Ja Cho v. In–Chul Song*, 286 A.D.2d 248, 729 N.Y.S.2d 117, 117 (2001) (*res ipsa loquitur* jury charge not required because plaintiff did not establish that the injuries she suffered from a chemical face peel would not occur in the absence of negligence).

■ 14. The standard operating procedures on the Shearwater—namely, leaving the halyard clipped to the forestaysail between cruises except between the last cruise of the day and the first cruise of the following day—were reasonable under the circumstances.

15. The crew of the Shearwater was properly trained and had substantial sailing experience. Biggins, the deckhand who lost control of the line that struck Ms. Tagle, testified credibly that he was handling the line carefully and that he does not remember why the line was unclipped. Biggins and Captain Zimmerman credibly testified that there is no reason to unclip the halyard between cruises other than to unfoul the line. There is no direct evidence that the halyard was clipped when the vessel departed with Ms. Tagle on board. Nevertheless, given that the halyard had to have been clipped to the sail for the first cruise of the day and given that there would have been no reason to unclip it between cruises, the Court concludes that Respondent has not proven, by a preponderance of the evidence, that the line was not clipped to the sail at the outset of Ms. Tagle's cruise.

16. Respondent argued at length that the "change" in policy after Ms. Tagle's injury requiring the halyard to be attached

---

5. Respondent relies exclusively on the Supreme Court's decision in *Johnson* to argue that *res ipsa loquitur* applies here. Resp't Post–Trial Letter Br. 3. The facts of *Johnson,* however, were very different than those here. In *Johnson,* a crew member dropped a block on the head of another crewmember. 333 U.S. at 47–48, 68 S.Ct. 391. There was no evidence that blocks are regularly dropped due to the movement of the ocean. In this case, on the other hand, Respondent's own expert testified that the risk from lines on a sailing vessel cannot be totally eliminated. Tr. 52, 95:13–20. While the Supreme Court held that "a man who is careful does not ordinarily drop a block on a man working below him," *Johnson,* 333 U.S. at 48, 68 S.Ct. 391, common sense says that sailors do, even when exercising ordinary care, sometimes lose control of a line—whether due to wind or an unexpected wave or wake. Thus, this Court is unwilling to conclude on the record before it that Respondent has demonstrated that deckhands do not lose control of lines except when they are negligent.

before the vessel left the dock was proof that the Petitioners were negligent. In her post-trial submission, Respondent conceded that Federal Rule of Evidence 407 rendered the evidence inadmissible to prove negligence, but argued that the evidence could be considered as impeachment evidence:

> At the time of trial, Captain Zimmerman maintained that it was *always* the petitioners' standard operating procedure to have the forestaysail halyard attached to the forestaysail in between excursions and not to attach same during an excursion. Subsequent to the incident involving Ms. Tagle, however, Captain Zimmerman changed whatever practice had been in effect at the time, instructing crewmembers that from then on, crewmembers were to attach the forestaysail halyard/pelican clip to the forestaysail *before* passengers were on board and *before* the vessel left the dock.
>
> ...[R]espondent is attempting to have the measure admitted into evidence to *rebut* the petitioners' defense that it was always their standard operating procedure to keep the forestaysail halyard attached to the forestaysail in between excursions.

---

**6.** Respondent did not argue that the second change in policy—namely, that two crewmembers had to handle a line whenever it was necessary to unhook a line while under weigh—was admissible to prove negligence. Nevertheless, the Court notes that change in policy is a subsequent remedial measure and, pursuant to Federal Rule of Evidence 407, is not admissible to prove negligence.

**7.** Respondent asserted that the Court should conclude that she proved negligence because (1) Biggins testified that he did not remember where the halyard had been clipped before he unclipped it and lost control, Tr. 370–73, and (2) Captain Zimmerman testified during his deposition that in order tó raise the forestaysail, the deckhand has to first ensure that the halyard is attached to the sail, Tr. 215, 372. Neither argument is persuasive to the Court,

Resp't Post–Trial Letter Br. 4 (emphasis in original).

17. Captain Zimmerman credibly testified that his admonition to the crew that the halyard should be hooked to the sail before the vessel leaves the dock applied to the first cruise of the day. Tr. 210. That "change" to standard operating procedures made sense given that he had just experienced the risk incurred when a deckhand must attach the line while the vessel is under weigh. That "change," however, does not cause the Court to be less confident in the truthfulness of Captain Zimmerman's testimony that the halyard was always attached to the sail when the vessel left the dock after the first cruise of the day, considering there was no reason to unhook the sail between cruises.[6]

18. Because there is no evidence that the vessel or its operators acted negligently, Respondent has not satisfied her burden of proving negligence by a preponderance of the evidence.[7]

## CONCLUSION

It is a truism that sometimes bad things happen and it is no one's fault. This is just such a case. Through no one's negli-

---

at least partially because the witnesses (Biggins and Captain Zimmerman) impressed the Court as having a tendency to answer questions literally and without speculation about where the interrogation was leading. Thus, while many witnesses might have testified in response to the question, "Where was the halyard prior to your losing control?" with "I don't recall, but it had to have been attached to the sail because this was the second sail of the day," Biggins responded, equally truthfully, "I don't know." Tr. 291:19. Similarly, in his deposition, Captain Zimmerman was asked what the deckhand would do when ordered to raise the forestaysail. Tr. 214:21–23. His response that "the clip needs to be attached to the sail" is literally correct. Tr. 215:2. The Court cannot infer from that answer that the halyard might not be clipped to the sail after the first sail of the day.

gence or ill-will, Ms. Tagle was struck while on a pleasure cruise. Because she has not demonstrated that the Petitioners were negligent, they are entitled to be exonerated from all liability for the incident. The Clerk is respectfully directed to close any open motions and to terminate the case.

**SO ORDERED.**